IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| JILL WELYTOK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:25-cv-110 (LMB/WEF) |
| DIRECTOR OF THE UNITED STATES | ) | |
| PATENT AND TRADEMARK OFFICE, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Pro se petitioner Jill Welytok ("Welytok" or "petitioner")—an intellectual property lawyer who, before the administrative proceedings that gave rise to this civil action, was authorized to practice before the U.S. Patent and Trademark Office ("USPTO" or "the agency")—is seeking review of the USPTO Director's final decision to exclude her from practice before the agency.[1]  Before the Court is Welytok's Second Amended Petition for Review, which has been fully briefed, and the Court has determined that oral argument will not aid the decisional process.  For the reasons discussed below, the USPTO Director's final decision will be affirmed.

## I.  BACKGROUND

### A.  Regulatory Background

Respondent's brief accurately outlines the federal statutes and regulations governing the representation of others before the USPTO, and petitioner does not dispute the applicability of these regulations.  35 U.S.C. § 2(b)(2)(D) authorizes the USPTO to promulgate regulations

---

[1] Although Welytok is a licensed attorney, she is proceeding pro se in this civil action because she is not authorized to practice before this Court.

"govern[ing] the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the [USPTO]." This provision grants broad authority to the agency to regulate the "service, advice, and assistance" that practitioners provide "in the prosecution or prospective prosecution of applications" for patents. Bender v. Dudas, 490 F.3d 1361, 1368 (Fed. Cir. 2007).

Pursuant to this statutory authority, the USPTO has promulgated the Rules of Professional Conduct, see 37 C.F.R. §§ 11.100–11.901, which govern who may practice before the agency and how that practice is to be conducted. These rules mirror the American Bar Association's Model Rules of Professional Conduct, see 78 Fed. Reg. 20180 (Apr. 3, 2013), and largely parallel their state bar equivalents. Relevant here, the regulations mandate that practitioners "provide competent representation" by using "the legal, scientific, and technical knowledge, skill, thoroughness and preparation reasonably necessary for the representation," 37 C.F.R. § 11.101; "abide by a client's decisions concerning the objectives of representation," id. § 11.102; "act with reasonable diligence and promptness in representing a client," id. § 11.103; and "take steps to the extent reasonably practicable to protect a client's interests" after the representation is terminated, id. § 11.116(d). The rules also prohibit practitioners from "[e]ngag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation." Id. § 11.804(c).

If any practitioner is found to have violated the Rules of Professional Conduct, the USPTO has the authority to "suspend or exclude" that individual "from further practice" before the agency. 35 U.S.C. § 32. Through its regulations, the agency has created a process by which it investigates allegations of professional misconduct, decides whether to charge a practitioner with those violations, and adjudicates those charges. The disciplinary process starts when the Director of the USPTO's Office of Enrollment and Discipline ("OED") "receives a grievance,

2

information or evidence from any source suggesting possible grounds for discipline." 37 C.F.R. § 11.22(a). Upon receiving such information, the "OED Director shall examine all information or evidence concerning possible grounds for discipline of a practitioner." Id. § 11.22(d). This may include any information the OED Director receives from the grievant, the practitioner, and any other person who may reasonably be expected to provide information regarding the investigation. Id. § 11.22(f)(1).

Upon the conclusion of the OED Director's initial examination, he may close the investigation without taking further action, issue a warning to the practitioner, enter into a settlement or diversion agreement with the practitioner, or institute formal charges. Id. § 11.22(h). If the OED Director believes that "grounds exist for discipline" and wishes to institute formal charges, he must first "convene a meeting of a panel of the Committee on Discipline," which is an independent group of attorneys at the USPTO outside of the OED that determines whether there is "probable cause" to bring charges. Id. § 11.22(h); 11.23; 11.32. If the Committee on Discipline finds probable cause, "the OED Director may . . . fil[e] a complaint" against the practitioner. Id. §§ 11.32; 11.34. If a complaint is filed, the next step in the process is a disciplinary hearing.

Disciplinary proceedings are conducted and adjudicated by hearing officers—commonly referred to as administrative law judges ("ALJs")—who are "designated by the USPTO Director" to determine whether a practitioner committed the charged violation and, if so, the appropriate sanction. Id. §§ 11.39(a); 11.54. The ALJs presiding over USPTO administrative disciplinary proceedings need not be USPTO employees. Rather, through what is colloquially known as the "ALJ loan program," see Bolton v. Pritzker, 2016 WL 4555467, at *7 (W.D. Wash. Sept. 1, 2016), Congress has allowed any agency "which occasionally or temporarily is insufficiently staffed with administrative law judges" to "use administrative law judges selected

3

by the Office of Personnel Management from and with the consent of other agencies." 5 U.S.C.

§ 3344. This practice has become the norm for USPTO administrative disciplinary proceedings.

Indeed, as the Federal Circuit has recognized, "[i]ndependent hearing officers outside the

immediate supervision of the PTO, typically ALJs from other agencies, oversee PTO disciplinary

proceedings." Correll v. Vidal, 2022 WL 2564106, at *2 n.2 (Fed. Cir. July 8, 2022) (observing

that an Environmental Protection Agency ALJ oversaw a USPTO disciplinary proceeding).

Although administrative in nature, the USPTO's disciplinary proceedings bear the

hallmarks of traditional litigation in Article III courts:  The OED Director bears the "burden of

proving the violation by clear and convincing evidence," 37 C.F.R. § 11.49; the practitioner may

raise affirmative defenses, which must be proven by clear and convincing evidence, id.; the

hearing officer receives evidence and legal argument on the record, id. § 11.44; and the parties

may file "[m]otions, including all prehearing motions commonly filed under the Federal Rules of

Civil Procedure," id. § 11.43.  The ALJ is also required to consider various factors in

determining the appropriate sanction, including "[w]hether the practitioner has violated a duty

owed to a client, the public, the legal system, or the profession"; "[w]hether the practitioner acted

intentionally, knowingly, or negligently"; "[t]he amount of the actual or potential injury caused

by the practitioner's misconduct"; and "[t]he existence of any aggravating or mitigating factors."

Id. § 11.54(b).  At the end of the hearing, the ALJ issues an "initial decision," which includes a

"statement of findings of fact and conclusions of law" and an explanation for any sanction

imposed.  Id. § 11.54(a)(1), (b).

"Within 14 days after the date of the initial decision of the hearing officer . . . either party

may appeal to the USPTO Director by filing a notice of appeal."  Id. § 11.55(a).  After the

appellant files an opening brief, the OED Director is entitled to file an opposition, after which the

appellant may file a reply.  Id. § 11.55(d), (e), (g).  Once briefing is complete, the "USPTO

4

Director has authority to conduct a de novo review of the factual record" and "may affirm, reverse, or modify the initial decision or remand to the hearing officer for such further proceedings as the USPTO Director may deem appropriate." Id. § 11.56(a). If the USPTO Director decides to suspend or exclude the practitioner from practice before the agency, he must issue a final order stating the "reasons for any such suspension or exclusion." 35 U.S.C. § 32. Finally, the practitioner may seek judicial review of a final order by filing a petition for review in the United States District Court for the Eastern District of Virginia. Id.; see Loc. Civ. R. 83.5.

## B. Factual and Procedural Background

The following facts—which are undisputed unless otherwise noted—are derived from the ALJ's initial decision and the USPTO Director's final order. See Shia v. USPTO, 2017 WL 5639912, at *3 (E.D. Va. Feb. 27, 2017).

### 1. Welytok's Representation of Garczynski

Welytok, who is a licensed attorney in Illinois and Wisconsin,[2] registered with the USPTO as a patent attorney in 2004. A4.[3] The conduct relevant to this dispute began in 2019 when Jack Garczynski ("Garczynski") retained Welytok "to prepare and file a non-provisional utility patent application for his . . . clothes hanger invention." Id. At the beginning of the representation, Garczynski paid Welytok two advance payments totaling $2,500 for her services

---

[2] Welytok was suspended from practice in Wisconsin and Illinois from 1999 to 2001 after the Supreme Court of Wisconsin found that she "had engaged in professional misconduct while representing a client over whom she held general durable power of attorney and health care power of attorney." A4. Welytok's misconduct included "submitting bills that were fraudulent," "using the client's money to buy a $3,000 television for herself," "charging and paying herself excessive fees from the client's funds," "failing to diligently manage the client's finances," and "engaging in dishonest conduct during the disciplinary proceeding by creating and submitting to the disciplinary board a misleading videotape." Id. n.2.

[3] Citations to "A__" refer to respondent's appendix, which is a truncated version of the administrative record. [Dkt. No. 18-1].

"which she did not deposit into a client trust account." A4–5. Shortly thereafter, on December 30, 2019, Garczynski asked Welytok via email whether she had filed the application and whether it was safe to publish a website and promote his invention, to which Welytok responded, "Yes, I will send the packet shortly."[4] A5. After realizing that "he had never received a charge on his credit card for the government filing fee," Garczynski asked Welytok for documentation to demonstrate that his application had been filed, to which Welytok responded with varying explanations of what she had filed and paid for on his behalf. See id. Ultimately, on February 12, 2020, Welytok emailed to Garczynski an "Acknowledgement Receipt" which "purport[ed] to show that the USPTO had received a submission from her on December 24, 2019, for an application assigned number 16654954 naming Mr. Garczynski as the inventor." Id.

Garczynski "eventually became uncomfortable with [Welytok] as his representative" and contacted Jeanette Braun ("Braun"), "a registered patent attorney with her own intellectual property firm and many years of experience before [the] USPTO," to seek "a second opinion." Id. Garczynski forwarded to Braun the Acknowledgement Receipt, but "Braun was unable to use the information in the document to file a power of attorney in Mr. Garczynski's patent matter because, according to the USPTO e-filing system, the application and confirmation numbers listed on the receipt did not match." A6. Braun observed that "the title of the invention was blank on the receipt, other information fields appeared to be missing entirely, and the formatting and alignment seemed 'wonky,'" leading her to discover that "the application number listed on the receipt was associated with a published patent for a different invention that was completely

---

[4] After public disclosure of an invention, an inventor must file a patent application within one year, or else the invention is no longer "novel," and the inventor forever loses his right to apply for a patent for the invention. 35 U.S.C. § 102. Therefore, Garczynski would not have publicized his invention online absent Welytok's assurance that she had filed the application. See A5 n.3.

unrelated to Mr. Garczynski or [Welytok]." Id.  Throughout the disciplinary proceeding, Welytok blamed a contractor for fabricating the Acknowledgement Receipt but never "produced [the contractor's] contact information or any evidence to corroborate his involvement in the matter." A7.  Moreover, after a series of communications between Welytok and Braun, Welytok informed Braun that she should "pretend like" no application had "ever [been] filed." Id.

On December 17, 2020, Braun filed a grievance with the USPTO against Welytok based on Welytok's representation of Garczynski because Braun's "interactions with [Welytok] had raised substantial questions about [Welytok's] honesty and trustworthiness, and because Mr. Garczynski had made a public disclosure based on [Welytok's] false representations, impacting his intellectual property rights."[5] A7–8.

2. Welytok's Representation of Kemp, Pro1Tek, and SMTMT

In 2017, Elizabeth Kemp ("Kemp") retained Welytok to represent the intellectual property rights of herself and her two companies, Priority Environmental Solutions, Inc. d/b/a Pro1Tek ("Pro1Tek") and SMT Medical Technologies, LLC ("SMTMT").  A8.  Kemp advanced Welytok $6,900 to file patent applications with respect to three inventions in connection with Pro1Tek.  Id.  Welytok placed the $6,900 "into an account holding [her] own funds instead of a client trust account." Id.  Welytok filed at least one of the patent applications as requested, id.; however, with regard to Welytok's representation of SMTMT, Kemp became disillusioned with Welytok's representation based on a series of incidents in which Welytok demonstrated a lack of understanding of the circumstances surrounding the intellectual property that was the subject of the representation and failed to take action as previously promised based on a series of

---

[5] Garczynski's application was eventually filed on November 22, 2021.  A6 n.5.

continuing excuses. A8–10. Therefore, on May 2, 2019, Kemp terminated Welytok's representation of SMTMT, and Welytok stopped acting as a representative of Pro1Tek. A10.

After Kemp's termination of Welytok's representation, the USPTO transmitted to Welytok a non-final rejection of one of Kemp's patent applications, but Welytok never advised Kemp of the USPTO's decision or Kemp's obligation to respond.[6] A11. Welytok also failed to provide Kemp with the files that Welytok had amassed during her representation despite repeated requests from Kemp and a state court order from an independent civil litigation that Kemp filed against Welytok in Wisconsin state court. A11–12. On September 19, 2019, Kemp filed a grievance against Welytok with the OED alleging that Welytok "had taken advance payments for work she never completed and had overbilled for matters that were not as complicated as she made them seem." A12.

3. The OED's Disciplinary Investigation

After receiving Kemp's grievance, Kimberly Weinreich ("Weinreich"), an OED staff attorney, started an investigation into Welytok's representation of Kemp, Pro1Tek, and SMTMT by sending Welytok several Requests for Information pursuant to 37 C.F.R. § 11.22(f). A12. On May 6, 2020, Welytok "transmitted to [the] OED a document intended to serve as a combined response to the [Requests for Information]" which simply "denied wrongdoing." Id.; A3677–94. Several months later, after the OED received Braun's grievance regarding Welytok's representation of Garczynski, Weinreich sent Welytok a separate Request for Information, A21908–13, to which Welytok responded simply by denying wrongdoing and informing "Weinreich that she was being treated for Lyme's disease and would upload supporting exhibits

---

[6] During the OED's investigation, Welytok produced electronic documents that purported to be email messages she sent to Kemp advising of the non-final rejection and the obligation to respond, but a forensic expert retained by the OED concluded that these documents were forgeries and were "never actually sent" to anyone. A11.

later," which Welytok never did.  A12–13.  At the close of Weinreich's investigation, she "concluded that [Welytok] had violated multiple ethical rules and recommended that the USPTO Committee on Discipline find probable cause to bring charges against [Welytok]."  A13.  The Committee on Discipline agreed and found probable cause on all of the alleged violations.[7] A23127.

    4. Proceedings Before the ALJ

On September 9, 2021, the OED filed a three-count "Complaint and Notice of Proceeding under 35 U.S.C. § 32" against Welytok alleging 26 violations of the USPTO's Rules of Professional Conduct during Welytok's representation of Garczynski, Kemp, Pro1Tek, and SMTMT.  A1; A28–45.  Pursuant to an Interagency Agreement between the Department of Housing and Urban Development ("HUD") and the USPTO authorizing HUD ALJs to "hear cases brought by the USPTO,"[8] the complaint was assigned to HUD ALJ Alexander Fernandez-Pons ("Fernandez-Pons"), who had been formally appointed to an ALJ position by then-HUD Secretary Benjamin S. Carlson on August 13, 2018.  A1 n.1; [Dkt. No. 16-1].

Welytok's failure to comply with the ALJ's orders and the rules governing the administrative proceeding began almost immediately.  After receiving an enlargement of time until November 12, 2021, to file her answer, Welytok failed to do so.  A1; A60.  Instead, she

---

[7] As discussed below, although Welytok argues that the OED never convened a Committee on Discipline, [Dkt. No. 10] at ¶ 90, the administrative record before this Court demonstrates that a Committee on Discipline was convened, see A23126–27, and Welytok has provided no evidence to the contrary.

[8] Welytok claims that the Interagency Agreement between HUD and the USPTO "expired more than a decade ago without renewal" and cited as support for that proposition footnote 1 of the ALJ's initial decision, [Dkt. No. 10] at ¶ 73; however, footnote 1 merely states that the Interagency Agreement became "effective" on March 27, 2013, see A1 n.1, and there is no evidence in the record before this Court that the Interagency Agreement had expired.

filed an answer on December 12, 2021, ten days after the ALJ found Welytok to be in default.[9]

A359–62. She also "did not identify any witnesses or submit any exhibits by the established deadlines" and failed to comply with the ALJ's order compelling her to respond to the OED's discovery requests. A2.

On June 1, 2022, the ALJ granted in large part the OED's motion for partial summary judgment, concluding that the undisputed evidence in the record revealed that Welytok violated four Rules of Professional Conduct. A1153. Specifically, the ALJ found that Welytok failed to (1) provide competent representation in refusing to "verify important information about [Garczynski's] patent matter before responding to his requests for legal advice," A1155–56; 37 C.F.R. § 11.101; (2) communicate properly with her client "by erroneously informing Mr. Garczynski that his application had been filed," which "deprived [him] of the ability to make an informed decision about how to proceed," A1156; 37 C.F.R. § 11.104; (3) properly handle client funds by depositing advance fees into personal accounts rather than client trust accounts, A1156–58; 37 C.F.R. § 11.115; and (4) safeguard client interests upon termination of representation by declining to "provide Ms. Kemp with a complete copy of her file as requested after [Welytok's] representation of Ms. Kemp had ended." A1158; 37 C.F.R. § 11.116. That decision left the remaining allegations of the OED complaint to be resolved by an evidentiary hearing before the ALJ. The next day, Welytok filed an "Emergency Petition" seeking reconsideration of the ALJ's entry of partial summary judgment. A1163–69. The ALJ denied Welytok's request. A1517–19.

On September 14, 2022, less than one week before the evidentiary hearing on the remaining issues in the OED's complaint, Welytok filed an "Emergency Motion to Adjourn" in

---

[9] The ALJ accepted Welytok's late-filed answer and affirmative defenses. A359–62.

which she "request[ed] a two-week adjournment due to a purported illness and hospitalization."

A2; A1543–46. Two days later, the ALJ entered an order finding that the documents Welytok

submitted in support of her motion "did not clearly identify her illness or show that she was

incapable of participating in the hearing and did not corroborate her claimed dates of

hospitalization." A2; A1576–79. In particular, the ALJ explained that there were "several

indicia of fabrication" in Welytok's documents, including spacing irregularities that would not

be expected in a hospital document and a timestamp indicating that the document was "created at

11:88 PM." A1577. Moreover, the ALJ observed that the letter indicates that Welytok was not

hospitalized but rather "visited a family medicine doctor." A1578. Accordingly, the ALJ

provided Welytok with an opportunity to explain her "apparent lack of candor" and directed the

parties to attend a virtual hearing to discuss concerns that Welytok may have filed false

statements. A1578–79. Welytok did not appear for that hearing, and the ALJ denied her

continuance request, finding that she "failed to establish her inability to participate in the hearing

and had provided inconsistent and potentially false information about her purported dates of

hospitalization."[10] A3.

　　　The ALJ held the virtual evidentiary hearing on September 21–22, 2022, during which he

received 27 exhibits into evidence and heard testimony from Garczynski, Braun, Kemp,

Weinreich, and a digital forensics expert. A2–3. Although Welytok failed to appear at the

hearing, A23098, both parties submitted post-hearing briefs. A3; A1746–59. On April 29, 2024,

---

[10] The ALJ also explained that Welytok would be permitted to cross-examine the OED's
witnesses at a later date if she established a legitimate medical reason for failing to appear at the
evidentiary hearing; however, Welytok never provided such an explanation. A3. Accordingly,
on October 28, 2022, the ALJ issued an order confirming that Welytok "had perjured herself in
her Emergency Motion, as well as in other correspondence with the Court, by making false
statements about her purported dates of hospitalization." A1701–15. That order also sanctioned
Welytok by referring her conduct to the OED for further disciplinary investigation. Id.

the ALJ issued his decision, in which he concluded that the USPTO demonstrated by clear and convincing evidence that Welytok had violated several Rules of Professional Conduct. A1–27. For example, the ALJ found that Welytok provided Kemp and SMTMT with "materially inaccurate and misleading legal advice," A15; see 37 C.F.R. § 11.101, and he concluded that Welytok failed to abide by her clients' decisions regarding representation because she did not file patent applications on behalf of Garczynski or SMTMT despite being hired to do so. A15–16; see 37 C.F.R. § 1.102. The ALJ also found that Welytok did not act with reasonable diligence when "she neglected to prepare, file, and prosecute a patent application for Mr. Garczynski's invention" and "neglected to prepare and file" an application for SMTMT "over the course of several months, despite representing that it would only take a few weeks to do and repeatedly assuring Ms. Kemp that she was working on the patent matter and planned to submit a filing immediately." A16; see 37 C.F.R. § 11.103. Finally, the ALJ found that Welytok failed to communicate accurately with her clients about fees and expenses, failed to take steps to protect her clients' interests, engaged in fraud and deceit, and engaged in conduct that is prejudicial to the administration of justice. A17–21. After considering the various factors identified in the USPTO's regulations for imposing an appropriate sanction, see 37 C.F.R. § 11.54(b), the ALJ concluded that the only appropriate sanction for Welytok's misconduct was her exclusion from practice before the agency. A2–26.

     5. Appellate Administrative Proceedings Before the USPTO Director

     On May 14, 2024, Welytok timely noticed an appeal of the ALJ's initial decision. A23144. Two days before the deadline for filing her appellate brief, Welytok filed an "Emergency Motion for Extension of Time to File Brief in Response to Initial Decision of Administrative Law Judge" in which she explained that "it would not be possible to timely file a brief addressing all required issues due to inordinately complexity [sic] of the issues." A23146.

She followed that motion with a supplemental motion seeking the same relief, explaining that the OED had not provided her with the administrative record. A23146–23165. The USPTO General Counsel—acting pursuant to authority delegated by the USPTO Director—denied Welytok's motions, concluding that Welytok had neither consulted with the OED before filing her motions as required by 37 C.F.R. § 11.55(o) nor established good cause for the requested relief. A23203–07. The USPTO General Counsel also emphasized that an OED paralegal's declaration, submitted by the OED in opposition to Welytok's request for an extension of time, clarified that Welytok was given access to the administrative record but had failed to download it as instructed. A23199; A23203–09.

On October 18, 2024, the USPTO General Counsel dismissed Welytok's appeal for failure to file her appellate brief and adopted the ALJ's decision, which became the final decision of the agency. A23305–12. Moreover, on December 23, 2024, the USPTO General Counsel denied Welytok's motion for reconsideration, describing the motion as "a hodge-podge of cut-and-pasted legal provisions and incomplete sentences with no analysis" and explaining that the motion "does little more than raise allegations previously made and rejected." A23393–94.

6. Petition for Review Before this Court

On January 22, 2025, Welytok filed her original Petition for Review, [Dkt. No. 1], which this Court dismissed without prejudice after finding that it was "simply impossible to assess the facts about which petitioner [was] complaining because so much of the pleading [was] disjointed and incomplete," [Dkt. No. 3] at 1. On February 26, 2025, Welytok filed an Amended Petition for Review, [Dkt. No. 4], but six days later, she filed a Motion for Leave to File Second Amended Petition, [Dkt. No. 6], which this Court granted, [Dkt. No. 9].

Welytok filed her Second Amended Petition for Review on March 4, 2025, seeking to "set aside the Final Order of the USPTO Director dated December 23, 2024 which implements

13

the Initial Decision of ALJ Fernandez-Pons." [Dkt. No. 10] at ¶ 4. The Second Amended Petition contains three assignments of error. Specifically, it alleges that (1) "ALJ Fernandez-Pons was not appointed in compliance with Article II, second 2, clause 2 of the U.S. Constitution," id. ¶ 10; (2) "ALJ Fernandez-Pons was hired in violation of the Administrative Procedure Act APA 5 USC §§3105 and 3144,"[11] id.; and (3) "[t]he USPTO imposed disciplinary sanction in the absence of probable cause findings made in compliance with APA 5 US §558 and USPTO Rules 37 CFR §11.2 et seq, and in violation of the separation of powers imposed by APA 5 USC §11.54(d)." Id.

## II. DISCUSSION

Under the Administrative Procedure Act, the USPTO's decision to exclude a practitioner from practice before the agency must be "affirmed unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Shia, 2017 WL 5639912, at *3 (quoting 5 U.S.C. § 706(2)(A)). "A decision is arbitrary and capricious if predicated on a clear error of judgment or mistake." Id. A petitioner bears the burden of demonstrating that the USPTO's decision must be reversed. President & Fellows of Harvard Coll. v. Lee, 589 Fed. Appx. 982, 984 (Fed. Cir. 2014).

## A. Appointments Clause and 5 U.S.C. § 3344

Welytok's first two assignments of error contend that ALJ Fernandez-Pons's appointment and subsequent designation to preside over her administrative disciplinary proceedings violated the Appointments Clause of the United States Constitution, see U.S. CONST. art. II, § 2, cl. 2, and the federal statute concerning how ALJs from one federal agency may be used by another

---

[11] Although the pleadings cite 5 U.S.C. § 3144, which does not exist, it appears that the parties intended to cite 5 U.S.C. § 3344, which is the federal statute concerning the detail of ALJs from one federal agency to another.

agency, see 5 U.S.C. § 3344. [Dkt. No. 10] at ¶ 10. Although petitioner's arguments are somewhat unorganized, they appear to raise three issues, each of which will be analyzed in turn.

First, petitioner seems to contend that Fernandez-Pons was not appointed to his position as a HUD ALJ in accordance with the Appointments Clause. See [Dkt. No. 10] at ¶¶ 46–47. As respondent correctly argues, this claim "poses little difficulty" because Fernandez-Pons was clearly appointed pursuant to the Constitution, [Dkt. No. 16] at 19. In relevant part, the Appointments Clause provides that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2. And as both petitioner and respondent recognize, see [Dkt. No. 10] at ¶ 46; [Dkt. No. 16] at 19, the Supreme Court has held that ALJs are inferior officers who may be appointed by the President, by a court, or by a department head, Lucia v. SEC, 585 U.S. 237, 244 & n.3 (2018). Because Congress has designated HUD as an "executive department" headed by a Secretary, 42 U.S.C. § 3532(a), it follows that the HUD Secretary may appoint the Department's inferior officers, including ALJs, see Lucia, 585 U.S. at 244.

That is exactly what happened here. As respondent's Exhibit A shows, on August 13, 2018—well before the commencement of Welytok's administrative disciplinary proceedings in 2021—HUD Secretary Benjamin S. Carlson[12] appointed Fernandez-Pons "as an administrative law judge of the United States, and authorize[d] [him] to execute and fulfill the duties of that office according to the Constitution and statutes of the United States." [Dkt. No. 16-1]. That exhibit establishes that Fernandez-Pons was properly appointed as a HUD ALJ by the HUD

_____

[12] Benjamin S. Carlos served as HUD Secretary from 2017 to 2021. See Ben Carlson, U.S. DEP'T HOUS. & URB. DEV., https://archives.hud.gov/secretaries/carsonbio.cfm (last visited Nov. 12, 2025).

Secretary in full compliance with the rules prescribed by the Constitution for the appointment of inferior officers.

Second, petitioner appears to argue that even if ALJ Fernandez-Pons may constitutionally preside over HUD administrative proceedings, he cannot constitutionally preside over another agency's proceedings, including the USPTO's administrative disciplinary proceedings. See [Dkt. No. 10] at ¶¶ 49–51. In his opposition, respondent correctly argues that Shoemaker v. United States, 147 U.S. 282 (1893), and Weiss v. United States, 510 U.S. 163 (1994), "require rejection of Welytok's constitutional argument." [Dkt. No. 16] at 20–21. In Shoemaker, the Supreme Court considered the constitutionality of a federal statute that established an independent commission to select the site for a park in the District of Columbia. 147 U.S. at 284. The statute provided that the Chief of Engineers of the United States Army and the Engineer Commissioner of the District of Columbia—both of whom were properly appointed to those positions—would serve on the commission. Id. The Shoemaker plaintiff argued that the statute unconstitutionally allowed those individuals to perform additional duties without a secondary appointment pursuant to the Appointments Clause. Id. at 288. But the Supreme Court found that because the "additional duties" were "germane to the offices already held by" the Chief of Engineers and Engineer Commissioner, it was not "necessary that they should be again appointed by the president and confirmed by the senate." Id. at 301. And the Supreme Court recently affirmed that reasoning in Weiss. There, the Court considered whether a statute permitting the Judge Advocate General to assign certain military officers—all of whom were properly appointed to their positions—to serve as military judges. 510 U.S. at 170. The Court held that the military officers did not need a second appointment pursuant to the Appointments Clause to serve as military judges because "the role of military judge is 'germane' to that of military officer." Id. at 176.

16

Applied here, respondent correctly asserts that the duties of an ALJ presiding over HUD administrative proceedings are clearly "germane" to the duties of an ALJ presiding over USPTO administrative proceedings, at least where the USPTO proceedings involve only questions about a practitioner's alleged misconduct, rather than technical and scientific questions surrounding a particular patent or trademark. Specifically, while presiding over HUD administrative proceedings, HUD ALJs rule on motions, control the conduct of discovery, take oral testimony, receive evidence, and issue initial decisions. 24 C.F.R. §§ 180.440, 180.500, 180.625, 180.670. These functions mirror the functions performed by ALJs who preside over USPTO administrative disciplinary proceedings. 37 C.F.R. §§ 11.43, 11.44, 11.49. Accordingly, because neither HUD nor the USPTO are attempting to "circumvent[] the Appointments Clause by unilaterally appointing an incumbent to a new and distinct office," Weiss, 510 U.S. at 174, allowing a properly appointed HUD ALJ to preside over a USPTO administrative disciplinary proceeding does not run afoul of the Appointments Clause. Accord Bolton, 2016 WL 4555467, at *7 (holding that "[n]o separate appointment was required" under the Appointments Clause for an Environmental Protection Agency ALJ to preside over the National Oceanic and Atmospheric Administration's administrative proceedings).

Petitioner replies that Shoemaker and Weiss are distinguishable because they involved instances in which Congress "expand[ed] the duties of validly appointed inferior officers" who were "serving within the same agency," whereas here, "ALJ Fernandez-Pons is moonlighting for a different agency in an entirely different executive department." [Dkt. No. 28] at 13. But this argument is unpersuasive because officers across the federal government may perform similar functions, see, e.g., Jones Bros., Inc. v. Sec'y of Labor, 898 F.3d 669, 679 (6th Cir. 2018) (analogizing Federal Mine Safety Commission ALJs to Securities and Exchange Commission ALJs), and for that reason, the test articulated in Shoemaker and Weiss focuses on whether the

17

duties of one office are germane to the duties of another, not on whether the offices are housed in the same agency or department. Moreover, even if there were any merit (there is not) to Welytok's argument that a HUD ALJ cannot constitutionally preside over a USPTO administrative proceeding, that argument is defeated by the fact that the USPTO General Counsel affirmed and adopted the HUD ALJ's initial decision, rendering it a final order of that agency.[13] A23310.

Third, Welytok argues that the USPTO's use of HUD ALJs violates 5 U.S.C. § 3344. See [Dkt. No. 10] at ¶ 73. As explained above, federal law permits any agency "which occasionally or temporarily is insufficiently staffed with administrative law judges" to "use" ALJs from other agencies, 5 U.S.C. § 3344; however, petitioner argues that, because the USPTO has used HUD ALJs "for multiple years," [Dkt. No. 10] at ¶ 69, that "use" is neither occasional nor temporary, as the statute requires. In other words, she contends that HUD ALJs "may not be used as a permanent staffing mechanism to circumvent" the Appointments Clause. [Dkt. No. 10] at ¶ 64. But as respondent argues, [Dkt. No. 16] at 23–24, petitioner's interpretation contravenes both the text and purpose of § 3344.

Section 3344 provides that "[a]n agency . . . which occasionally or temporarily is insufficiently staffed with administrative law judges . . . may use administrative law judges selected by the Office of Personnel Management from and with the consent of other agencies." Starting with the text, respondent urges this Court to adopt the position taken in Bolton, in which the plaintiff argued that § 3344 prohibited the National Oceanic and Atmospheric Administration from using Environmental Protection Agency ALJs "for almost five years." 2016 WL 4555467,

---

[13] Petitioner also claims that Fernandez-Pons "has previously been disqualified from presiding over USPTO Disciplinary hearings on Constitutional grounds," [Dkt. No. 10] at ¶ 50; however, there is no evidence in the record before this Court to support petitioner's claim.

at *7. The federal district court found that § 3344 did "not impose a limit on how long an agency can use an ALJ from another agency." Id. That conclusion correctly rejects a cramped interpretation of § 3344, and the statute's purpose only confirms its plain meaning. As respondent's authorities indicate, the purpose of § 3344 was to "permit[] an interchange of hearing commissioners among the agencies" to "reduce the use of temporary hearing officers," "save expense," "provide some variety for the hearing commissioner," and "impart fresh points of view to the agencies." Atty. Gen. Committee on Administrative Procedure, Final Report 49 (1941). To that end, § 3344 "is intended to permit those [agencies] who do not need full-time examiners to borrow them as needed as well as to aid those agencies which may become temporarily or occasionally insufficiently staffed." H.R. Rep. No. 79-1890, at 280–81 (emphasis added); see also Antonin Scalia, The Hearing Examiner Loan Program, 1971 DUKE L.J. 319, 340 ("The loan program has generally fulfilled the . . . expectation that it would prevent the hiring of hearing examiners by agencies with insufficient work to employ them full time."). Accordingly, this Court finds that § 3344's text and purpose support a robust use of the ALJ loan program and refute Welytok's narrow interpretation of the ALJ loan program.

B. Administrative Procedure Act and USPTO Regulations

Petitioner's final assignment of error alleges that the USPTO imposed a sanction in violation of the Administrative Procedure Act and USPTO procedures and without any record of adverse findings. At the outset, the Court agrees with respondent's description of Welytok's arguments as being "difficult to comprehend." [Dkt. No. 16] at 25. Welytok did not organize her arguments into cohesive categories, many of her sentences are completely indecipherable, and she failed to provide evidentiary support for her assertions. For instance, the Second Amended Petition alleges: "AlJ [sic] Fernandez-Pons argues that do not mention [sic] 5 APA§558 ( )cases [sic] in support of this argument that not mention [sic] APA 5 USC §558 (c)

which is necessary to give for [sic] a licensee an"[14]opportunity [sic] to put its house in lawful

order before more formal agency proceedings are taken." [Dkt. No. 10] at ¶ 95. Elsewhere in

the Second Amended Petition, without citing any cases, Welytok writes: "The remaining USPTO

Regulations do not contemplate delegation of the duties of for [sic] the approximate 12 to 15

non-reciprocal cases a year that may require the OED Director to convene a Committee on

Discipline." [Dkt. No. 10] at ¶ 105. And her reply brief—which is full of fragments and

confusing assertions—does not help to clarify her arguments. For example, in attempting to

explain that the USPTO Director did not produce certain records, Welytok states: "USPTO Rule

37 CFR §11.22, which requires a [sic] that USPTO [sic] conduct a written investigation of all

possible grounds for discipline, Requests for Information (RFI's)." [Dkt. No. 28] at 16.

Although courts must liberally construe the filings of pro se parties to identify their

claims, Erickson v. Pardus, 551 U.S. 89, 94 (2007), courts are not required to "conjure up

questions never squarely presented to them" or "construct full blown claims from sentence

fragments," Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). In other words,

"[l]iberal construction does not mean . . . that the Court can ignore a clear failure in the pleading

to allege a cognizable claim," Neal v. JCI, 2025 WL 448999, at *1 (D. Md. Feb. 10, 2025). This

is especially true where the pro se petitioner is an attorney. Nonetheless, respondent has

helpfully identified three primary assertions petitioner appears to have made to support her claim

that the agency violated the Administrative Procedure Act and its own regulations.

First, Welytok claims that the OED Director did not convene a Committee on Discipline

as required by 37 C.F.R. §§ 11.22(h)(3) and 11.23. [Dkt. No. 10] at ¶ 90. But as respondent

correctly argues, the evidence in the administrative record points to the contrary. To begin, ALJ

---

[14] This extraneous quotation mark appears in Welytok's Second Amended Petition.

Fernandez-Pons stated in his factual findings that Weinreich "recommended that the USPTO Committee on Discipline find probable cause to bring charges against [Welytok]." A13. Moreover, at the September 22, 2022, virtual hearing before the ALJ, counsel for the OED Director asked Weinreich about her initial investigation into Welytok's conduct. When asked about the results of her investigation, Weinreich responded that she "recommended that . . . the Committee on Discipline find probable cause in the matter." A23126. And when asked what the Committee on Discipline's determination was, she responded that "[t]hey found probable cause on all of the alleged violations." A23127. Therefore, Weinreich's testimony supports the conclusion that the OED Director convened a Committee on Discipline, and Welytok has presented no evidence to support her contrary speculation.

Second, and relatedly, Welytok argues that the ALJ violated 5 U.S.C. § 554(d) by allowing Weinreich to testify, [Dkt. No. 10] at ¶ 106; however, as respondent points out, the statute upon which Welytok relies explicitly permits USPTO employees to serve as witnesses in hearings before the agency, [Dkt. No. 16] at 29. In relevant part § 554(d)(2) provides that "[a]n employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not . . . participate or advise in the decision, recommended decision, or agency review . . . except as witness or counsel in public proceedings." In other words, this statute means that "no employee engaged in investigating or prosecuting may also participate or advise in the adjudicating function." Withrow v. Larkin, 421 U.S. 35, 52 (1975); see also Greenberg v. Bd. of Governors of Fed. Rsrv. Sys., 968 F.2d 164, 167 (2d Cir. 1992) ("The APA is violated only where an individual actually participates in a single case as both a prosecutor and an adjudicator."). The statute does not prohibit—in fact, it explicitly authorizes—an agency's employees to serve as witnesses in hearings before the employing agency.

21

Finally, Welytok contends that "[i]n his Initial Decision, ALJ Fernande-Pons [sic] acknowledged that in his decision there is no record of the OED Director's made [sic] findings 5 USC §558 [sic]." [Dkt. No. 10] at ¶ 91. In other words, it appears that Welytok is complaining that the OED Director violated § 558(c) by failing to "make written findings" regarding her misconduct. Id. ¶ 94. 5 U.S.C. § 558(c)(1) provides:

> Except in the cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given notice by the agency in writing of the facts or conduct which may warrant the action.

As an initial matter, respondent correctly argues that § 558(c)(1) did not impose an obligation on the USPTO to provide Welytok with "notice . . . of the facts or conduct" that warrant the discipline because, as the administrative record shows, this case is replete with evidence that Welytok's misconduct was willful. Hutto Stockyard, Inc. v. U.S. Dep't of Agric., 903 F.2d 299, 304 (4th Cir. 1990) (defining "willfulness" in § 558(c) as "an intentional misdeed or gross neglect of a known duty"). For example, as the ALJ explained in his decision, "after Mr. Garczynski noted that he had not been charged a filing fee and requested documentation of filing, [Welytok] fired off three emails in rapid succession providing specific, false filing dates, and falsely representing that a fee had been charged to her own credit card." A20. Welytok also sent a fabricated Acknowledgement Receipt and "continued to falsely insist she had filed a non-provisional application," after which she "told Ms. Braun to proceed as if no applications had been filed." A20–21. This misconduct represents Welytok's "deceitful" intent to "conceal[] her failure to file a patent application as she was hired to do." A21.

Moreover, contrary to Welytok's assertions, and as the ALJ explicitly stated in his decision, the Requests for Information that the OED sent to Welytok provided her with "the requisite notice and procedure mandated under 5 U.S.C. § 558(c)." A13. This procedure, the

22

ALJ explained, is consistent with other USPTO decisions that have found that Requests for Information explain the facts and conduct at issue and provide practitioners with the opportunity to demonstrate compliance with USPTO regulations or to explain their misconduct. Id. (citing Moatz v. Bender, Proceeding No. D00-01, at 9–11 (USPTO Sept. 30, 2003)). Welytok responds that ALJ Fernandez-Pons incorrectly concluded that the Requests for Information "were equivalent to the notice of findings that the OED Director was required to provide to compliance [sic] with APA 5 USC §558," [Dkt. No. 10] at ¶ 96; however, this conclusory statement does not support a finding that the ALJ's decision was arbitrary, capricious, or not in accordance with law, particularly given that petitioner has not cited to any legal authority indicating that Requests for Information do not provide requisite notice under § 558(c)(1). In sum, there is ample evidence in the record before this Court that the agency followed the correct procedures in disciplining Welytok for her misconduct.

### III. CONCLUSION

For the reasons stated above, the USPTO Director's final decision will be affirmed by an Order to be issued with this Memorandum Opinion.

Entered this 18 day of November, 2025.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge